DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 328-6100
Andrew J. Bernstein (AB 5441)
M. Alexis Pennotti (MP 4425)
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MUHAMMAD TARIQ BILAL,

                Plaintiff,

           -against-

BEST BUY CO., INC.,

               Defendant.

Index No. 06-civ-4015 (CM)

*Electronically Filed*

**RULE 56.1 STATEMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant Best Buy Co., Inc. ("Best Buy"), contends that there are no remaining genuine issues of material fact remaining for trial on the following issues:

1.      Best Buy has an equal opportunity employment policy, a "harassment-free workplace" policy, a "zero tolerance" policy against retaliation for complaints of discrimination and harassment in the workplace, and a detailed complaint procedure. Bilal Dep. at 40:2-17; 41:9-13; 42:11-15; Doyle Dec. at ¶4; Bernstein Aff. at Ex. B.

2.      True and correct copies of Best Buy's equal opportunity policy, harassment-free workplace policy, anti-retaliation policy and complaint procedure are located in Best Buy's Business Code of Conduct, Orientation Handbook and Employee

Handbook.  Doyle Dec. at ¶¶5, 6

3.      Best Buy's equal opportunity employment policy (the "EEO Policy") bars discrimination based on "national origin...during hiring, selection for training, promotion, transfer, layoff, termination, leaves of absence, rates of pay or any other term or condition of employment."  Bernstein Aff. at Ex. B. at. 6.

4.      Best Buy's harassment-free workplace policy (the "Harassment-Free Policy") prohibits "any type of harassment in the workplace by an employee, supervisor, customer or visitor", including but not limited to harassment on the basis of "national origin".  Bernstein Aff. at Ex. B. at. 6.

5.      Best Buy's zero-tolerance policy on retaliation (the "Anti-Retaliation Policy") provides that "[a]ny employee who reports a possible violation of the law or Company policy is protected from retaliation by Best Buy."  Bernstein Aff. at Ex. B. at 4. The policy declares that "[r]etaliation for reporting a concern (even if the concern if eventually unsubstantiated) is prohibited."  *Id.*

6.      Best Buy's complaint procedure gives employees multiple avenues to report incidents of discrimination, harassment and retaliation.  Bernstein Dec. at Ex. B at 28-29.  The procedure explicitly promises that Best Buy will investigate any report of discrimination or harassment.  *Id.*

7.      The complaint procedure for each of the equal opportunity, harassment-free workplace and anti-retaliation policies prohibits any form of retaliation against any employee who has filed a complaint or assists in the investigation of a complaint stating that "any form of retaliation in violation of this policy will not be tolerated and will result in discipline up to and including discharge."  *Id.*

2

8.      Best Buy's equal employment opportunity, harassment-free workplace and anti-retaliation policy, as well as its complaint procedure, are produced and regularly updated in Best Buy's Business Code of Ethics and employee handbook, distributed to employees periodically, and posted on bulletin boards accessible to employees. Doyle Dec. at ¶¶5, 6; Bernstein Dec. at Exs. D & E.

9.      Employees submit an acknowledgement of receipt of each of the policies and the complaint procedure. Doyle Dec. at ¶7; Bernstein Dec. at Ex. C.

10.     On October 26, 2002, Best Buy hired Mr. Bilal as a temporary employee to work in Best Buy's store in West Nyack, New York (the "West Nyack Store"). Bilal Dep. at 34:18-25; 35:2-16; Bernstein Dec. at Ex. F.

11.     On October 26, 2002, Mr. Bilal acknowledged receipt of Best Buy's Orientation Handbook. Bilal Dep. at 43:2-17; Bernstein Dec. at Ex. C.

12.     The orientation handbook Mr. Bilal acknowledged contains the same EEO Policy, Anti-Harassment Policy, Anti-Retaliation Policy and complaint procedure contained in Best Buy's employee handbook. Doyle Dec. at ¶8.

13.     On January 12, 2003, Mr. Bilal became a part-time Merchandising Specialist in the West Nyack Store. Bilal Dep. at 36:18-25; 37:2-6; Bernstein Dec. at Ex. F.

14.     On March 23, 2003, Best Buy made Mr. Bilal a full-time Merchandising Specialist. Bernstein Dec. at Ex. F.

15.     As a Merchandising Specialist, Mr. Bilal reported to Pedro Torres (who is Hispanic), a Supervisor in the Merchandising Department, Adam Munoz (who is Hispanic), Merchandising Manager and Keith Waldman, General Manager of the West

Nyack Store.  Bilal Dep. at 36:5-14; 43:18-21; 44:2-7; 106:3-8; Waldman Dec. at ¶8; Munoz Dec. at ¶¶2, 11; Torres Dec. at ¶¶2, 6.

16.    Mr. Munoz approved Mr. Bilal's promotion from a seasonal to a part-time employee (Munoz Dec. at ¶9) and each of these individuals either recommended or approved Mr. Bilal's promotion to a full time position.  Bilal Dep. at 36:18-25; 37:2-6, 17-25; 38:2-3; Torres Dec. at ¶9; Munoz Dec. at ¶10; Waldman Dec. at ¶7.

17.    As a Merchandising Specialist, Mr. Bilal was responsible for accepting and unloading deliveries.  Bilal Dep. at 35:25; 36:2-4; Munoz Dec. at ¶10.

18.    Best Buy has a tiered line-manager structure whereby each department has "senior" employees, who are responsible for shift managerial duties as they come up, supervisors, who are responsible for supervising employees during a shift, and managers, who manage the department as a whole (i.e. scheduling, disciplining, hiring and firing employees).  Waldman Dec. at ¶6.

19.    On July 6, 2003, Mr. Bilal received a written warning for failing to call out or show up for his scheduled shift on July 2, 2003.  Bilal Dep. at 44:19-25; 49:17-21; Munoz Dec. at ¶¶12, 13; Bernstein Dec. at Exs. G & H.

20.    On July 6, 2003, Mr. Bilal received a written warning for failing to contact a manager or show up for his scheduled shift on July 3, 2003.  Bilal Dep. at 44:19-25; 49:17-21; Munoz Dec. at ¶¶12, 13; Bernstein Dec. at Exs. G & H.

21.    On July 8, 2003, Mr. Munoz instructed the merchandising team that no employee was to leave at the end of their shift without notifying Mr. Torres or Monty Laveste, a senior on the merchandising team.  Bilal Dep. at 51:22-25; 52:2-4; Munoz Dec. at ¶14; Bernstein Dec. at Ex. I.

4

22.     On July 11, 2003, Mr. Bilal left at the end of his shift without notifying Mr. Torres or Mr. Laveste.  Bilal Dep. at 52:21-24; Munoz Dec. at ¶15; Bernstein Dec. at Ex. I.

23.     On July 13, 2003, Mr. Munoz disciplined Mr. Bilal for violation of the procedure.  Bilal Dep. at 62:10-13; Munoz Dec. at ¶16; Bernstein Dec. at Ex. I.

24.     On July 14, 2003, Mr. Bilal complained to Best Buy that Mr. Munoz, Mr. Torres and Mr. Laveste, were discriminating against him based on his race.  Bilal Dep. at 54:22-25; 55:2-7; Doyle Dec. at ¶9; Bernstein Dec. at Ex. J.

25.     On July 14, 2003, Mr. Bilal complained that after an argument with Mr. Torres in June 2003, Mr. Torres began to discipline him for absences.  Bernstein Dec. at Ex. J.

26.     On July 14, 2003, Mr. Bilal complained that Mr. Torres gave him "hard work while the other white employees were only given light work."  Bilal Dep. at 65:17-19; Bernstein Dec. at Ex. J.

27.     Best Buy promptly investigated Mr. Bilal's July 14, 2003 complaint. Doyle Dec. at ¶10.

28.     Specifically, Michael Doyle, the Regional Human Resources Specialist responsible for the West Nyack Store, discussed Mr. Bilal's complaint with Mr. Waldman.  Bilal Dep. at 64:22-25; 65:2-5; Doyle Dec. at ¶11; Waldman Dec. at ¶¶10, 11.

29.     Mr. Waldman, in turn, interviewed Mr. Munoz, Mr. Torres and Mr. Laveste.  Waldman Dec. at ¶15.

30.     Mr. Munoz, Mr. Torres and Mr. Laveste denied Mr. Bilal's allegations. Waldman Dec. at ¶¶16, 17.

31.     Best Buy instructed Mr. Munoz, Mr. Torres and Mr. Laveste that it does not tolerate discrimination or harassment.  Waldman Dec. at ¶¶16, 17.

32.     Mr. Waldman also interviewed Mr. Bilal, who requested a transfer to a customer service area as a resolution to his complaint.  Waldman Dec. at ¶18.

33.     At the end of the investigation, Best Buy was not able to corroborate Mr. Bilal's allegations.  Doyle Dec. at ¶15; Bernstein Dec. at K.

34.     Despite the lack of corroboration, Mr. Waldman reiterated to Mr. Munoz, Mr. Torres and Mr. Laveste Best Buy's discrimination, harassment and retaliation policies and he instructed them to abide fully by the policies at all times.  Waldman Dec. at ¶20.

35.     At the conclusion of the investigation, Mr. Doyle informed Mr. Bilal that a position in the computer department at the West Nyack Store, a customer service position, would be opening shortly and he encouraged Mr. Bilal to apply for the position. Bilal Dep. at 73:5-9; Doyle Dec. at ¶19; Bernstein Dec. at K.

36.     At the conclusion of the investigation, Mr. Doyle informed Mr. Bilal of the remedy Best Buy had put in place to stop the alleged harassment.  Doyle Dec. at ¶19; Bernstein Dec. at K.

37.     At the conclusion of the investigation, Mr. Doyle asked Mr. Bilal to contact him in the future if he felt "he needed to do so."  Doyle Dec. at ¶19; Bernstein Dec. at K.

38.     On October 26, 2003, in response to Mr. Bilal's request, Mr. Bilal was transferred to a position as a Home Office Product Specialist.  Bilal Dep. at 86:17-18; Doyle Dec. at ¶¶20, 21; Waldman Dec. at ¶¶21, 22.

39.     As General Manager of the West Nyack Store, Mr. Waldman approved Mr. Bilal's transfer to the new position.  Waldman Dec. at ¶¶21, 22.

40.     As a result of this transfer, Mr. Bilal was moved from a stockroom position to a sales position.  Doyle Dec. at ¶22; Waldman Dec. at ¶23.

41.     Mr. Bilal was satisfied with the transfer as a resolution to his complaint. Bilal Dep. at 86:5-9.

42.     In April 2004, Mr. Bilal applied and interviewed for a position as a senior in the computer department of the West Nyack Store.  Bilal Dep. at 88:8-12; Munoz Dec. at ¶¶22, 23.

43.     Mr. Munoz and another Best Buy employee conducted the interview. Bilal Dep. at 92:8-11; 93:16-18; 99:22-25; Munoz Dec. at ¶23.

44.     Mr. Munoz asked Mr. Bilal technical questions during the interview.  Bilal Dep. at 92:12-17; Munoz Dec. at ¶26.

45.     Mr. Bilal did not answer Mr. Munoz's questions proficiently.  Munoz Dec. at ¶26.

46.     Mr. Munoz also interviewed Bradley Kudrick for the senior position in the computer department.  Bilal Dep. at 19-20; Munoz Dec. at ¶24.

47.     In April 2004, Mr. Kudrick worked in a different department than Mr. Bilal and reported directly to a different supervisor than Mr. Bilal.  Waldman Dec. at ¶26.

48.     Mr. Munoz asked Mr. Kudrick similar technical questions to the questions he asked Mr. Bilal.  Munoz Dec. at ¶26.

49.     Mr. Kudrick answered Mr. Munoz's questions proficiently.  Munoz Dec. at ¶26.

50.     Mr. Munoz recommended to Mr. Waldman that Mr. Kudrick receive the promotion to the senior position in the computer department.    Munoz Dec. at ¶27; Waldman Dec. at ¶28.

51.     Based on Mr. Munoz's recommendation and a comparison of Mr. Kudrick's and Mr. Bilal's personnel records with Best Buy, Mr. Waldman promoted Mr. Kudrick to the senior specialist position in the computer department on May 2, 2004. Bilal Dep. at 101:17-20; 102:19-20; Waldman Dec. at ¶¶29, 30, 31.

52.     At no time during his employment did Mr. Bilal ever complain that Best Buy's failure to promote him was based on his national origin or in retaliation for filing a complaint seven months earlier.    Bilal Dep. at 146:17-20; Doyle Dec. at ¶¶23-25; Waldman Dec. at ¶45.

53.     Mr. Munoz was transferred to another Best Buy store in June 2004. Munoz Dec. at ¶3.

54.     Best Buy has a written procedure that governs the processing of transactions entitled "Transaction Accountability" (the "Transaction Policy").    Waldman Dec. at ¶31; Bernstein Dec. at Ex. L.

55.     The Transaction Policy explains that when a cashier processes a credit card, Best Buy's system will display one of four authorization messages: "approved", "referral", "declined" or "invalid".    Waldman Dec. at ¶32; Bernstein Dec. at Ex. L.

56.     When a cashier gets a "referral" message, the Transaction Policy requires voice authorization from the credit card company to process the transaction.    Waldman Dec. at ¶33; Bernstein Dec. at Ex. L.

57.     Specifically, the cashier is required to "call the Credit Card Company to

obtain voice authorization using the telephone number and merchant number displayed on the register. Bernstein Dec. at Ex. L.

58.     If the Credit Card Company approves the transaction, key the approval number into the register and imprint a legible copy of the credit card on the store copy of the receipt." Bernstein Dec. at Ex. L.

59.     The Transaction Policy instructs cashiers to "[n]ever key a false code." Waldman Dec. at ¶34; Bernstein Dec. at Ex. L.

60.     The Transaction Policy's instruction not to key a false code is based on the rationale that if the cashier cannot obtain an approval number from the credit card company, the card may be fraudulent. Bilal Dep. at 114:25; 115:2-3; Waldman Dec. at ¶35.

61.     In the absence of a valid authorization code, the credit card company will not pay Best Buy in the event that the transaction "fails" as a result of a problem with the credit card. Bilal Dep. at 115:12-19; Waldman Dec. at ¶36.

62.     On February 4, 2005, Mr. Bilal acknowledged receipt of the Transaction Accountability Policy and acknowledged that he "must refer to the SOP Online for the entire policy on forms of payment, transaction types and transaction accountability." Bilal Dep. at 117:17-25; Bernstein Dec. at Ex. M.

63.     On February 4, 2005, Mr. Bilal affirmed that he understood that "failure to comply with company policy and procedure will result in disciplinary action up to and including termination, according to the Transaction Accountability Guidelines." Bernstein Dec. at Ex. M.

64.     On or about April 26, 2005, Best Buy discovered that Mr. Bilal had

manually approved two recent credit card transactions without getting approval from the credit card company.  Bilal Dep. at 126:19-23; Waldman Dec. at ¶38.

65.     The credit cards for both transactions were fraudulent.  Waldman Dec. at ¶39.

66.     As a result of Mr. Bilal's violation of the Transaction Policy, Best Buy took a loss of more than $3,000.  Bilal Dep. at 126:13-20; Waldman Dec. at ¶39.

67.     When Best Buy confronted Mr. Bilal about the transactions, he admitted that when Best Buy's system prompted him to call the credit card company, he "did not call the vendor for referral" and he "approved manually" by entering false codes.  Bilal Dep. at 127:11-12; Waldman Dec. at ¶40; Bernstein Dec. at Ex. N.

68.     On April 26, 2005, Best Buy terminated Bilal's employment for violating Best Buy's Credit Card Transaction Policy.  Bilal Dep. at 139:10-13; Waldman Dec. at ¶41.

69.     Other than the incident with Mr. Bilal, Best Buy has never suffered a loss based on one of the employees of the West Nyack Store entering a false code to process a credit card transaction in violation of the Transaction Policy.  Waldman Dec. at ¶42.

70.     As General Manager of the West Nyack Store, Mr. Waldman would have been informed if Best Buy had suffered a loss based on one of the employees at the West Nyack Store entering a false code to process a credit card transaction in violation of the Transaction Policy.  Waldman Dec. at ¶43.

71.     If Mr. Waldman had discovered that any of the West Nyack Store employees had entered a false code to process a credit card transaction, he would have terminated the employee's employment immediately, as he did with Mr. Bilal.  Waldman

Dec. at ¶44.

72.     Shortly after Best Buy terminated Mr. Bilal's employment, he began working for the Monsey 7-Eleven.  Bilal Dep. at 154:9-16.

73.     At 7-Eleven, Mr. Bilal's hourly rate is $9; the same as his last hourly rate at Best Buy.  Bilal Dep. at 154:19-25.

74.     Although Mr. Bilal is eligible for medical benefits at the same cost as he was contributing while employed by Best Buy, Mr. Bilal has declined to pay for medical benefits at 7-Eleven.  Bilal Dep. at 155:2-20.

75.     Mr. Bilal is making more money at 7-Eleven than he was making at Best Buy.  Bilal Dep. at 158:15-22.

76.     Mr. Bilal is happier working at 7-Eleven than he was working at Best Buy. Bilal Dep. at 158:15-22.

Dated: New York, New York
       March 16, 2007

DREIER LLP

Andrew J. Bernstein (AB 5441)
M Alexis Pennotti (MP 4425)
499 Park Avenue
New York, New York 10022
(212) 328-6100
Attorneys for Defendant

To:     Barry D. Haberman, Esq.
        254 South Street
        New City, New York 10956
        (845) 638-4294
        Attorneys for Plaintiff

11